
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TAPJETS INC.,

Plaintiff,

- against -

UNITED PAYMENT SERVICES, INC.,

Defendant.

**ORDER**

19 Civ. 3740 (RRM) (VMS)

**Vera M. Scanlon, United States Magistrate Judge:**

Plaintiff Tapjets Inc. ("Plaintiff") brought this action against Defendant United Payment Services, Inc. ("Defendant") alleging a variety of state statutory and common law claims. See ECF No. 1. In an Order dated September 14, 2020, the Court found good cause to modify the schedule to extend Plaintiff's time to file a motion for leave to amend its complaint. See ECF No. 41. Before the Court is Plaintiff's motion for leave to file its Proposed Amended Complaint ("PAC") to add successor liability and fraud claims against Direct Connect Merchant Services, LLC ("Direct Connect") as a new defendant. See ECF No. 47; see also ECF No. 48. Defendant opposed. See ECF No. 49. For the following reasons, Plaintiff's motion to amend is granted.

## I. FACTUAL BACKGROUND

Although the Court assumes the parties' familiarity with the facts of the case from prior Orders and proceedings, see ECF Nos. 41-42, what follows is a brief factual summary pertinent to the instant motion.

Plaintiff is a company offering private jet charter services. See ECF No. 1-2 at 13-46 ("Complaint") ¶ 10. On or around February 18, 2016, Plaintiff and Defendant entered into an agreement for Plaintiff to use Defendant's credit card payment processor services to verify that

client credit card transactions were approved or authorized by the card's issuing bank. See id. ¶¶ 11-18, 34. Once a credit card transaction was approved or authorized, Plaintiff would provide its services pending settlement of the client's credit card payment to Plaintiff's account. See id.

On or about October 17, 2016, Plaintiff sold the first of five jet trips to an international client paying with a credit card. See id. ¶¶ 54-56. Plaintiff dispatched the flight after following Defendant's procedures to verify that the $74,500.00 transaction was authorized by the card's issuing bank. See id. ¶ 54. On or about October 24, 2016, Plaintiff still had not received the funds, but Defendant assured Plaintiff that it had investigated the transaction, that the transaction had been approved and that Plaintiff would receive the funds. See id. ¶ 56.

In or around early November 2016, Plaintiff sold two additional flights for $147,980.00 to the same client again paying by credit card. See id. ¶ 57. Plaintiff used Defendant's procedures to verify that the transaction was authorized and approved by the card's issuing bank and dispatched the flights. See id. This time, Defendant deposited the funds into Plaintiff's account. See id.

On or about November 11, 2016, Plaintiff sold two more flights for $150,940.00 to the same client and again dispatched the flights pending settlement of the credit card transaction after verifying through Defendant's service that the card's issuing bank authorized the payment. See id. ¶ 58. These funds had not been deposited into Plaintiff's account when, on or about November 16, 2016, Plaintiff received an undated letter from non-party First Data stating that its Security Department had suspended the release of additional funds to Plaintiff pending First Data's review of proper documentation supporting the transaction. See id. ¶¶ 58-61; ECF No. 1-6 at 9 (Exhibit 23). According to Plaintiff, it found the First Data letter confusing because

Defendant had led Plaintiff to believe that Defendant directly provided its payment processor services without any third-party involvement. See Complaint ¶ 59.

On or about November 30, 2016, Plaintiff allegedly learned that, in addition to Defendant's failure to deposit certain funds from the flight sales into Plaintiff's account, Defendant had allegedly withdrawn funds from Plaintiff's account. See id. ¶¶ 55, 60-61. On or about that same date, Defendant further notified Plaintiff that all funds in Plaintiff's account would be held for chargebacks, or transaction reversals, due to evidence that the international client's credit card transactions were fraudulent. See id. ¶¶ 63-67; ECF No. 1-7 at 1 (Exhibit 24); id. at 8-11 (Exhibit 27) (email from Plaintiff's representative describing the fraudulent credit card transactions by "HKM holdings"); see also ECF No. 25-5 at 3 (Note from 11/30/2016 12:07:54 PM); ECF No. 25-5 at 4 (Note from 11/28/2016 8:47:32 AM).

On or about November 30, 2016, Defendant informed Plaintiff that it "no longer wanted to continue doing business . . . and was closing [Plaintiff's] account." See Complaint ¶ 67. Defendant also gave Plaintiff an undated letter from First Data with a similar message and advising that Plaintiff's "obligations to fund any chargebacks resulting from sales processed for [Plaintiff] by [Defendant] survive[d] termination of the agreement." See id. ¶ 68; ECF No. 1-7 at 12 (Exhibit 27). When Plaintiff contacted Defendant to ask about the chargebacks for fraudulent transactions, which Plaintiff's use of Defendant's payment processor services were meant to avoid, Defendant told Plaintiff that it was an independent sales organization of First Data and that Plaintiff thereafter would need to address all issues with First Data. See id. ¶ 70.

On or about January 6, 2017, Defendant sold its assets to a company named Direct Connect pursuant to an Asset Purchase Agreement ("APA"). See ECF No. 25-4; ECF No. 27 at

8. The APA stated that Direct Connect would purchase and acquire from Defendant certain assets owned or held by Defendant as of December 31, 2016, at 11:59 PM:

> Subject to the terms and conditions of this Agreement, at the Closing, [Defendant] will grant, sell, assign, transfer and deliver to [Direct Connect], and [Direct Connect] will purchase and acquire from [Defendant], all right, title and interest of [Defendant] in, to and under the assets, properties and business, of every kind and description, wherever located, real personal or mixed, tangible or intangible, owned or held or used in the conduct of the Business by [Defendant] as the same shall exist as of December 31, 2016 at 11:59 PM ("the Transfer Effective Date")[.]

See ECF No. 48 § 2.1 (underline in original). These assets included "all Contracts and all rights under any and all Contracts pertaining to the Business," see id. § 2.2(c), as well as "all cash that is held for the benefit or on behalf of any client or customer or related to deferred revenues," see id. § 2.2(o). See also id. § 1.1 (defining "Contract" to include customer contracts and customer orders). The APA further provided that although Direct Connect generally disclaimed an assumption of Defendant's liabilities arising out of Defendant's executory obligations under contract assets subject to certain exclusions, Direct Connect agreed to assume other liabilities as defined in the APA. See id. §§ 2.4-2.5. Defendant agreed in the APA to "indemnify, defend and hold harmless" Direct Connect for any and all losses for which Direct Connect was not liable under the APA, and Direct Connect agreed to "indemnify, defend and hold harmless" Defendant for any and all losses for which Defendant was not liable under the APA. See id. § 10.1. The APA provided that it was "governed by and construed and enforced in accordance with the internal laws of the State of New York[.]" See id. § 11.7.

On or about January 13, 2017, Defendant filed a certificate of dissolution with the California Secretary of State.[1]

---

[1] See Cal. Sec'y of State, The Cal. Business Search, https://businesssearch.sos.ca.gov/ (search "Search Type" for "Corporation Name" and "Search Criteria" for "United Payment"; then follow "United Payment Services Inc.") (last visited April 21, 2021); J & J Sports Prods., Inc. v. La

## II. PROCEDURAL HISTORY

Pursuant to Federal Rules of Civil Procedure 15 and 21, Plaintiff moves to amend the complaint to add Direct Connect as a defendant to this action and to assert claims of successor liability and fraud against Direct Connect. See ECF No. 47. Plaintiff's proposed claims against Direct Connect derive from Direct Connect's purchase of Defendant's assets in the APA. See ECF No. 48. According to Plaintiff, Direct Connect is liable to Plaintiff under either an exception to New York's general rule that a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities, or pursuant to the terms of the APA, or both.[2]

Defendant opposes Plaintiff's motion on grounds of undue delay, undue prejudice and futility. See ECF No. 49.

## III. DISCUSSION

### A. Legal Standard

Once an answer is served, Federal Rule of Civil Procedure 15 allows a plaintiff to amend its complaint "only with the opposing party's written consent or the court's leave." Fed. R. Civ.

---

Parranda Mexicana Bar & Restaurante Co., No. 17 Civ. 4171 (AMD) (SJB), 2018 WL 4378166, at *1 n.3 (E.D.N.Y. Apr. 9, 2018) (citation omitted) (noting court's ability to take judicial notice of information from Secretary of State website).

[2] "Generally, under New York common law, a business entity's acquisition of assets from another . . . results in no successor liability, with four exceptions: (1) the successor corporation expressly or impliedly assumed the liabilities of its predecessor; (2) there was a consolidation or de facto merger of the two business entities; (3) the successor is a 'mere continuation' of the predecessor; or (4) the transaction is entered into fraudulently to escape such obligations." DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A., 413 F. Supp. 3d 187, 214 (S.D.N.Y. 2019) (internal quotations & citation omitted). The Court does not make any findings or conclusions of law with respect to Defendant's arguments that Plaintiff's proposed claims against Direct Connect are futile under these standards because, as discussed below, Defendant lacks standing to raise those arguments on Direct Connect's behalf in this posture. See ECF No. 49; Section III.D, infra.

P. 15(a)(2). According to the rule, a court should "freely give leave when justice so requires." Id.; see Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). "[I]t is within the sound discretion of the court whether to grant leave to amend." John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994). If the amendment seeks to add a party, Federal Rule of Civil Procedure 21 also applies, which allows addition of a party "at any time, on just terms." Fed. R. Civ. P. 21. The application of Rule 21 does not change the court's analysis, as the "showing necessary under Rule 21 is the same as that required under Rule 15(a)(2)." Johnson v. Bryson, 851 F. Supp. 2d 688, 703 (S.D.N.Y. 2012); see Saravia v. Royal Guard Fence Co., No. 19 Civ. 2086 (DRH) (SIL), 2020 WL 5231696, at *9 (E.D.N.Y. Sept. 2, 2020) ("In deciding whether to permit the addition of a party under Rule 21, courts apply the same standard of liberality afforded to motions to amend pleadings under Rule 15.") (citation & internal quotation marks omitted).

Under both Rules 15 and 21, leave to amend should be granted unless there is evidence of "undue delay, bad faith or dilatory motive[], undue prejudice [or], futility[.]" Williams v. Citigroup Inc., 659 F.3d 208 (2d Cir. 2011) (citing Forman v. Davis, 317 U.S. 178, 182 (1962)). "While the party seeking to amend its pleading must explain any delay," United States ex rel. Raffington v. Bon Secours Health Sys., Inc., 285 F. Supp. 3d 759, 765 (S.D.N.Y. 2018), the party opposing the amendment "bears the burden of showing prejudice, bad faith, and futility of the amendment[,]" Grant v. Citibank (S.D.), N.A., No. 10 Civ. 2955 (KNF), 2010 WL 5187754, at *6 (S.D.N.Y. Dec. 6, 2010) (citing Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)).

**B. The Court Does Not Find Undue Delay In Plaintiff's Proposed Amended Complaint**

When a motion "is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice" the non-movant, such "undue delay" should weigh against granting leave to amend. Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981). Defendant argues that Plaintiff's motion for leave to amend its complaint was unduly delayed and should therefore be denied because Plaintiff waited more than two years after learning of the APA to add Direct Connect as a party. See ECF No. 49 at 1-2. The Court disagrees.

There is no undue delay here because Plaintiff timely made this motion upon an extension of time granted by the Court. See ECF No. 41; Dkt. Entry 10/15/2020; see, e.g., Puchalski v. FM Constr., Inc., No. 18 Civ. 1596 (SJB), 2020 WL 6727777, at *10 (E.D.N.Y. Nov. 16, 2020) (finding that "there is no undue delay" where the motion to amend was made before the deadline to file the motion expired). The extension of time was granted because the Court found that: (i) it was reasonable for Plaintiff to wait for confirmation of potential claims against Direct Connect before seeking to amend the complaint; and (ii) Plaintiff exhibited diligence by moving for extension of time to amend less than two months after it discovered that it had potential claims against Direct Connect. See ECF No. 41 at 9-10. To the extent that Defendant again argues here that Plaintiff had a copy of the APA between Defendant and Direct Connect since before the commencement of this lawsuit in Texas on November 30, 2018, the Court overruled that same delay argument when it granted Plaintiff's motion for an extension of time to make the instant motion. See id. (noting that Plaintiff had had longstanding general

knowledge of the APA, but finding that Plaintiff reasonably sought the Court's leave to file the instant amendment motion less than two months after a November 29, 2019, document production confirmed that Plaintiff's account was among those that Defendant sold to Direct Connect with the APA); ECF No. 49 at 1-2. At the time of the Court's Order dated September 14, 2020, the general difficulties caused by the COVID-19 pandemic further supported the reasonableness of its finding that Plaintiff's application for leave to make the instant motion lacked undue delay.

Defendant does not offer any reason for the Court to revisit that ruling at this time other than to point to an email written by Plaintiff's owner on July 14, 2018, stating that Defendant could not shift blame to Direct Connect and questioning whether Defendant had disclosed Plaintiff's claims to Direct Connect. See ECF No. 9-1 at 10; In re Kristan Peters, 642 F.3d 381, 386 (2d Cir. 2011) (finding that "law of the case doctrine . . . counsels a courts against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, inter alia, the need to correct a clear error or prevent manifest injustice") (internal quotations & citations omitted). The email does not show that Plaintiff should have known to add Direct Connect much sooner; to the contrary, the email shows that at the time it was written, Plaintiff believed that Defendant and not Direct Connect was liable. Given the evidence offered that it was the later confirmation that Defendant had sold Plaintiff's account to Direct Connect with the production of UPS000001-UPS000003 that was the prompt for the proposed amendment, the amendment is timely. See ECF No. 27 at 8 (referring to UPS000001-UPS000003 as proof that Plaintiff has a potential claim against Direct Connect).

For these reasons, there was no undue delay by Plaintiff that weighs against granting leave to amend.

### C. The Court Does Not Find Undue Prejudice To Defendant In Plaintiff's Proposed Amended Complaint

Defendant's argument that granting Plaintiff's motion for leave to amend would be prejudicial fares no better. "Prejudice to the opposing party . . . has been described as the most important reason for denying a motion to amend." Frenkel v. New York City Off-Track Betting Corp., 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009) (internal quotation marks omitted). Prejudice results when the proposed amendment would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000); see also Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2d Cir. 1998) ("One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.") (citation & internal quotation marks omitted).

Defendant argues that allowing Plaintiff to amend the complaint to add claims against Direct Connect would be prejudicial because, under the APA, Defendant would be liable to defend and indemnify Direct Connect such that Defendant would have to expend significant additional resources on behalf of Direct Connect. See ECF No. 49 at 6. This is insufficient to establish undue prejudice. If Plaintiff were required to file a separate action against Direct Connect if the amendment were not permitted, Defendant would also expend funds, possibly even more than in this lawsuit, pursuant to its possible obligation to defend or indemnify Direct Connect. See Bon Secours Health Sys., 285 F. Supp. 3d at 766 ("Mere allegations that an amendment will require the expenditure of additional time, effort, or money do not themselves

constitute undue prejudice.") (citation & internal quotation marks omitted). In any event, discovery in this case has not yet closed, see Docket Scheduling Order 2/23/2021 (staying discovery), and Defendant and Direct Connect would be afforded sufficient opportunity to prepare for trial, see Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an amendment [comes] on the eve of trial and would result in new problems of proof.") (citation & internal quotation marks omitted). Given the impact of the coronavirus pandemic on the Court's trial schedule, any civil trial is unlikely to be held until 2022, even if the parties in this case were ready for trial now, which they are not.

In light of the foregoing, the Court does not find that granting Plaintiff leave to amend the complaint would unduly prejudice Defendant.

**D. Defendant Lacks Standing to Argue That Plaintiff's Proposed Addition Of Successor Liability And Fraud Claims Against Direct Connect As A New Defendant Would Be Futile**

Defendant argues that Plaintiff's proposed addition of successor liability and fraud claims against Direct Connect as a new defendant would be futile. Neither party addressed the preliminary issue of whether Defendant has standing to make these arguments on behalf of a non-party.

The majority of Courts have held that "current parties unaffected by the proposed amendment do not have standing to assert claims of futility on behalf of proposed defendants." Custom Pak Brokerage, LLC v. Dandrea Produce, Inc., No. 13 Civ. 5592 (NLH) (AMD), 2014 WL 988829, at *2 (D.N.J. Feb. 27, 2014) (alterations & internal quotation marks omitted); accord Malek v. Chef's Roll, Inc., No. 18 Civ. 3205 (BRM) (ESK), 2021 WL 822787, at *14 (D.N.J. Mar. 4, 2021); O'Gorman v. Mercer Kitchen L.L.C., No. 20 Civ. 1404 (LJL), 2021 WL 602987, at *2 (S.D.N.Y. Feb. 15, 2021). "To be sure, some courts have allowed a defendant to

assert futility on behalf of a prospective defendant, but in these cases there was usually a 'close legal relationship' between the two." N.Y. Wheel Owner v. Mammoet Holding B.V., 481 F. Supp. 3d 216, 250 (S.D.N.Y. 2020) (citing Agri Star Meat & Poultry, LLC v. Moriah Capital, L.P., No. C10-1019, 2011 WL 1743712, at *7 (N.D. Iowa May 6, 2011)); Soroof Trading Dev. Co. v. GE Microgen, Inc., 283 F.R.D. 149-52 (S.D.N.Y. 2012)).

In the instant matter, the indemnification allegation is of the type commonly found in sales contracts between entities dealing at arms-length and without any ongoing legal relationship. The Court does not find an obligation to indemnify or defend sufficient to show that Defendant and the proposed defendant have a "close legal relationship" that would permit Defendant to argue futility of the proposed amendment on behalf of Direct Connect.

Some courts have considered arguments by current parties as to the futility of proposed amendments against non-parties under, inter alia, the court's own authority to review proposed amendments for futility. See, e.g., Werner Deconstruction, LLC v. Siteworks Servs. NY, No. 15 Civ. 7682 (MLC), 2017 U.S. Dist. LEXIS 65181, at *18-19 (D.N.J. Apr. 27, 2017) ("Instead, the Court has the inherent authority to review a proposed amendment for futility and the [c]ourt exercises this authority herein.") (citation omitted); Danaher Corp. v. Travelers Indem. Co., No. 10 Civ. 121 (JPO), 2016 WL 1255739, at n.2 (S.D.N.Y. Mar. 30, 2016) (declining to decide whether a non-party has standing to oppose a motion to amend because regardless, "the Court must consider whether the proposed amendment is futile or unduly delayed"). There may be an appealing efficiency to that approach where it may be clear on the face of the pleadings that the proposed amendment is patently futile. Absent such certainty however, judicial efficiency is more likely to suffer if the Court were to entertain the futility argument because the proposed defendant would, in effect, get two bites of the same apple. See O'Gorman, 2021 WL 602987 at

*2 ("On this record, a decision to entertain the futility arguments coming from the mouth of Mercer Hotel Corp. but not being made with authority on the behalf of the new defendants would give those new defendants the best of both worlds, permitting them to enjoy a favorable ruling without suffering the consequences of an adverse ruling, all to the detriment of judicial efficiency.") (citation omitted). The Court is therefore persuaded that the best approach is to permit amendment and let the proposed defendant, once properly served, appear to make its own arguments to be dismissed by which it may be bound.

**E. Plaintiff Was Not Granted Leave To File A Motion To Amend With Respect To Former Defendants Scott Rosen and Craig Rosen And It Must Remove That Claim From Its PAC Before Filing It Pursuant To This Order**

Although the Court grants Plaintiff's motion to file its PAC as discussed above, Plaintiff must remove the alter-ego claim against non-parties and former defendants Scott Rosen and Craig Rosen ("the Rosens") from the pleading it files on the docket in compliance with this Order. This is because that alter-ego claim against the Rosens was dismissed from the action in an Order dated June 26, 2019, and, along with it, the Rosens as parties. See ECF No. 14; see also ECF No. 24. Then, on September 14, 2020, more than a year after the alter-ego claim and the Rosens were dismissed from this action, the Court also denied Plaintiff's motion for leave to file a motion to amend its complaint to bring the Rosens back in as parties. See ECF No. 41. These rulings being the law of the case, there is no basis for the alter ego count or the Rosens to remain in the PAC.

**F. Defendant May Not Argue The Futility Of Plaintiff's Attorneys' Fee Claim In Opposition To Plaintiff's Amendment Motion Because The Claim Was Included In Plaintiff's Original Complaint Such That It Does Not Constitute A Proposed Amendment To The Pleading**

Plaintiff's original complaint included a brief paragraph near its end requesting damages from Defendant that included an award of reasonable costs and attorney's fees. See Complaint ¶

152. The request was not framed as a standalone claim against Defendant, and it remains in Plaintiff's PAC. See ECF No. 47-2. Defendant argues that Plaintiff should be required to delete the paragraph from any PAC the Court grants Plaintiff leave to file because, according to Defendant, Plaintiff is not entitled to recover fees and costs in connection with its claims even if Plaintiff prevails. See ECF No. 49. Defendant's argument is incorrectly made in this procedural posture in which the Court's futility analysis is limited to the new material that Plaintiff has asked the Court for leave to add to its PAC.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion at ECF Nos. 47-48, for leave to amend the complaint to add Direct Connect as a party and to assert its proposed claims. On or before July 29, 2021, Plaintiff should refile its amended complaint on the docket. Within 30 days of that date, Plaintiff shall effect service upon the new defendant and file proof of such service on the docket. Within 30 days of Plaintiff's service, all Defendants must answer or otherwise respond.

Dated: Brooklyn, New York
July 22, 2021

*Vera M. Scanlon*

VERA M. SCANLON
United States Magistrate Judge